Filed 12/8/14  In re S.B. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re S.B., a Person Coming Under the Juvenile Court Law. | B253156 |
| | (Los Angeles County Super. Ct. No. CK93521) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> REGINALD B., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Rudolph A. Diaz, Judge.  Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Tarkian & Associates, Arezoo Pichvai for Plaintiff and Respondent.

Reginald B. (father) appeals from jurisdictional[1] orders made pursuant to Welfare and Institutions Code[2] section 300 declaring his daughter, S.B., a dependent of the court and retaining jurisdiction over the case. Father claims there is insufficient evidence to support dependency jurisdiction because the allegations against him in the petition were related only to past harm to S.B. He argues there was no evidence of any substantial risk of future harm to S.B. at the time of the jurisdictional hearing, since S.B. was living with her mother, T.M.,[3] at the time and father had agreed to the custody arrangement. Therefore, father asserts that the dependency court should have terminated the matter at the jurisdiction hearing. We disagree and affirm.

## FACTS AND PROCEDURAL BACKGROUND

*Initial Investigation and Detention*

The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) on May 7, 2012, when a caller reported that S.B. (then 14 years old) had suffered emotional abuse, general neglect, and physical abuse by father, the paternal grandmother (grandmother), a paternal aunt, and a paternal cousin. The caller indicated that S.B. was living in a dirty house filled with mice, cockroaches and rats. The kitchen had exposed electric wires, a leaking sink and hazardous substances placed on the same shelf as food items. The caller also reported that the paternal aunt had forced S.B. to drink alcohol and had placed a cigarette in S.B.'s mouth, and that grandmother acted violently towards S.B. and pulled S.B.'s hair. Father

---

[1]     Father's notice of appeal includes both the jurisdictional and dispositional orders made in this matter. However, father has expressly limited his argument on appeal to his claim that the "court should not have even *reached* a disposition hearing because it should not have even assumed jurisdiction in the first place, but instead, dismissed the dependency petition for lack of evidence of current risk of harm."

[2]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[3]     Mother is not a party to this appeal.

2

reportedly used foul language and watched pornographic movies in S.B.'s presence. The caller further stated that grandmother and father "talk[] down" to S.B. and that S.B. felt isolated.

The investigating social worker met with the family on May 7, 2012. S.B. told the social worker that she did not feel safe in the home because of the way grandmother treated her and that her father did not support S.B. S.B reported that grandmother had previously grabbed her by her collar and pulled her hair, and that her family "curses and puts her down." She also complained that the home was dirty and had mice and roaches. S.B. denied seeing any drugs in the home and stated that father did not drink or use drugs.

S.B. denied any current sexual abuse, but told the social worker that when she was younger, her cousin, M.W., touched S.B.'s vagina and her father and grandmother did nothing about it. S.B. told the social worker that she did not want to stay at the home and wanted to stay with her mother.

The social worker also met with father and observed the home, which she reported to be "slightly unkempt, with food on the couch, torn down cabinets in the kitchen, utilities in working order . . . with no visible structural safety hazards." Father denied any abuse of S.B. and stated that the allegations were "ridiculous and false." Father stated that the only discipline he used was talking, but then admitted that he "whoops" S.B. with a belt and that he "knows to use a belt and not to leave any marks or bruises." Father confirmed that S.B., grandmother, the paternal aunt, and M.W.'s four year old child resided in the home, but reported that M.W. had slashed his tires and he had kicked M.W. out of the home.

Father presented a family law court order granting temporary physical custody of S.B. to him with no visitation rights for mother, with a pending court date on June 25, 2012. Father stated that mother had refused to return S.B. home from a recent visit,

3

violating their prior custody agreement[4] and requiring father to get a court order to retrieve S.B.

Father said S.B. did not want to live with him because he was strict and mother allowed S.B. to do whatever she wanted. The social worker reported that father was "difficult to engage" and uncooperative, refusing to sign consent forms to release S.B.'s medical or school records to DCFS. However, father did initially agree to and sign a safety plan for S.B. DCFS did not remove S.B. from father's home at this time.

The next day, May 8, father called the social worker and stated that he would not comply with the safety plan, cooperate with the investigation, or allow the social worker to return to the home until he spoke with her supervisor. Father did agree to schedule a Team Decision Making meeting, but would not allow the social worker to come to his home to speak with his family until the meeting.

DCFS detained S.B. on May 11, 2012, after S.B. called the social worker from school and said she was afraid to go home. S.B. reported that father did not give her lunch money or money for clothes, and that she had been sharing lunch with her friends and wearing dirty clothes. S.B. asked the social worker to come pick her up. The social worker told S.B. that, if DCFS took her into protective custody, she would have to be in foster care. S.B. indicated that she understood but did not want to return to father's home, that she could not "take it" anymore and was afraid to return home. S.B. also told the social worker that she had been sexually molested by M.W. a second time when S.B. was ten years old.

On May 14, 2012, mother gave the social worker a handwritten letter by S.B. describing incidents that had taken place in father's home. S.B wrote that she would hear her father making sexually explicit comments to women on the telephone and having sexual relations at night "through the walls." S.B. also complained that father did not buy

---

**4** Pursuant to a stipulation and order filed July 3, 2002 in Los Angeles Superior Court, father had primary physical custody of S.B., with "reasonable visitation" to mother. Mother filed a petition to show cause in 2004, alleging that her signature on the July 3, 2002 stipulation was forged. That petition was denied by the family law court.

her school supplies or personal hygiene products, that the house was dirty and vermin-infested, and that grandmother was "now starting to hit me and pull my hair." She also asserted that M.W. forced her to drink alcohol and smoke a cigarette, had previously sexually molested S.B., and that her father "didn't do anything about it." S.B. stated that she was "scared of the way [father] looked, and the way he acted, and the things he said." S.B. wrote that she hated living with father and wanted to live with mother. Mother reported to DCFS that she was concerned because when S.B. spent time with mother on vacation, S.B. was unwilling to return to father's home.

*Section 300 Petition and Detention Hearing*

On May 16, 2012, DCFS filed a petition under section 300, subdivisions (a), (b), and (d), on behalf of S.B. In support of subdivision (a), the petition alleged that father had previously "physically abused [S.B.] by striking her with a belt," and that, as a result, S.B. was "afraid of the father and no longer desires to reside with the father." In support of subdivision (b), the petition alleged: (1) S.B. had been sexually abused by M.W. and that father knew of the abuse and failed to protect S.B.; (2) father physically abused S.B. as alleged above; (3) grandmother had physically abused S.B. by striking her and pulling her hair and that father knew or should have known of this abuse and failed to protect S.B.; (4) father "engaged in sexual activity in the child's home, in the child's presence," including watching pornography in S.B.'s presence; (5) father "established a filthy, unsanitary and hazardous home environment" for S.B., including "mice, cockroach and insect infestation" and "inoperable toilets and sinks"; and (6) father allowed M.W. to reside in the home and have unlimited access to S.B. and M.W. had forced S.B. to drink alcohol. In support of subdivision (d), the petition repeated the allegations regarding M.W.'s sexual abuse of S.B. and father's sexual activity in S.B.'s presence.

At the detention hearing on May 16, 2012, the court found a prima facie case that S.B. was a child described in section 300, subdivisions (a), (b) and (d) and ordered her detained.

5

*First Amended Petition and Jurisdiction Hearing*

DCFS filed its Jurisdiction/Disposition Report (jurisdiction report) on June 22, 2012. In the report, DCFS detailed an additional interview with S.B. on June 14, 2012, during which she reiterated a number of her prior statements. S.B. added that father hit her with a belt most recently in March 2012. On this occasion, father made S.B. take off her clothes except her underwear and lie on the bed, which made her uncomfortable. Father then hit S.B. "more than ten times," leaving three to five big, red welts on her leg that lasted about a week. In addition to seeing pornographic movies father left running on television and hearing him have sexual relations with his girlfriend, S.B. also stated she saw the couple run naked from the bathroom through father's home. S.B. supplied an additional, undated letter to DCFS, addressed to her father, in which she stated that while living with her father, she thought about killing herself and running away.

Mother told the social worker she met father when she was 15 years old and father was 35 years old. The two began having a sexual relationship when she was 17 years old and moved in together when she was 18 years old. Mother left father when S.B. was one year old. Father sued for and obtained primary custody of S.B. Mother stated S.B. had not wanted to live with father since she was seven years old. Mother said she did not know about father hitting S.B. with a belt, but that S.B. had disclosed to her the sexual abuse by M.W. around the time it happened and that mother told father about it.

Father denied hitting S.B. with a belt, stating "[m]aybe I should have. She gets away with murder." He denied that grandmother pulled S.B.'s hair, stating that grandmother was "too old" to do so and could "barely move around the house." Father responded to the allegation that he participated in sexual activities in S.B.'s presence by stating, "When she told me, I was married, is that a crime?" Father said M.W. "only stayed" in his home "for a month at the end of last year." Grandmother told DCFS that she heard father hit S.B. with a belt, but denied that she had pulled S.B.'s hair.

S.B. reported that, during a visit with father at the group home where she was staying, father told her he would let her live with her mother if she said she was lying

6

about the allegations. Following that incident, father stopped visiting S.B. and stated that he would see her in court.

In a Last Minute Information filed on June 26, 2012, DCFS reported that both parents had agreed that S.B. should be released to mother. Per DCFS's recommendation, the dependency court dismissed the sexual abuse allegations under section 300, subdivision (d) and ordered S.B. released to mother, with monitored visitation for father.

A July 2012 interim review report stated that mother indicated that father began exposing himself to her after father gave her a summer job when she was 15 years old and he was 35 years old. Mother was uncomfortable, did not know what to do, and did not want to lose her job. They had oral sex when she was 15 years old and sexual intercourse when she was 16 years old. They moved in together when she was 18 years old and mother got pregnant with S.B. the following year.

DCFS filed a first amended petition on July 23, 2012 adding allegations under section 300, subdivision (b) that father had an unresolved history of inappropriate sexual boundaries, including father's sexual relationship with mother when mother was a minor. The first amended petition also alleged that father engaged in sexually explicit conversations in S.B.'s presence, ran naked through the home with a female companion in S.B.'s presence; and made loud sexual noises, all of which made S.B. uncomfortable and physically ill. Father denied the new allegations in the first amended petition, including allegations about sexual contact with mother when she was 15 years old.

In September 2012, DCFS reported that mother was unemployed and struggling financially. DCFS was assisting mother with basic needs because she was having difficulty adjusting to S.B. in her home. However, by May 2013, mother was employed and S.B. was doing well in mother's home.

The juvenile court conducted a contested jurisdiction hearing over eleven days between May 22 and October 3, 2013. S.B. testified that, while she was in father's car, he made sexually explicit remarks to his girlfriend over the telephone "almost every day" on the way home from school, starting when S.B. was 12 or 13 years old. The statements

made S.B. sick to her stomach. S.B. also confirmed her prior statements concerning father's sexual behavior in S.B.'s presence, the unsanitary condition of father's home, father's inaction after M.W. molested S.B., father hitting S.B. with a belt leaving welts on her back and legs, and grandmother's mistreatment of S.B., including pulling her hair.

S.B. also recounted two recent incidents in which father appeared to attempt to influence S.B.'s testimony. First, S.B. confirmed the conversation she had with father during an unmonitored visit, where father told her to "'say that this was a lie," and then father would let S.B. live with her mother. S.B. testified that this conversation made her feel "uncomfortable and upset." Second, S.B. detailed an instance where father brought his friend, Alex Avant, to speak with her while she was sitting in the courthouse waiting to testify. S.B. stated that Mr. Avant, whom she did not know very well, told her he missed her and wanted to take her shopping, let her drive a car, and take her to Disneyland. He also told her that he wanted to put her in a girls' singing group to be the "next Destiny's Child," but that "dreams cannot come true in Antioch" (where she was living at that time with her mother).

S.B. further testified that, during her last monitored telephone call for her birthday with father, he stated, "You can go on believing a lie if you want to, I'm not fighting for you. You can stay with your mom." At the end of the conversation, father told S.B. "Fuck you." The social worker who monitored the telephone call eventually terminated the conversation because father was yelling and acting inappropriately. Although the social worker did not hear father say "Fuck you," she thought it was possible because father was "sort of all over the place" and was not allowing her to speak. The social worker called S.B. back to check on her and reported that S.B. was very upset.

Mother and father gave conflicting testimony at the hearing about how old mother was when they met and began having sex. Mother reiterated her prior statements that the sexual conduct began when she was 15 years old. Father testified that it did not begin until mother was 18 years old. Father admitted telling S.B. to lie across his bed and then giving her "a whupping" with a belt to discipline her in early 2012. Father denied telling

8

S.B. to undress and stated he did not leave any marks on her body because "I know better," but that he "struck her enough so that she would learn and understand." Father also denied speaking to his girlfriend in an inappropriate manner while S.B. was in the car. Despite the dependency court's order requiring a neutral monitor for phone calls with S.B., father admitted calling S.B. directly a few weeks earlier, but claimed his DCFS case worker had told him mother could serve as the monitor. The case worker denied ever making such a statement to father. Father also stated that after he called directly and mother told him he needed to have the social worker as the monitor, he had his son call S.B. the next day with father present. Father stated that he did not make more frequent phone calls to S.B. because he was unhappy with the restricted access to her when "I know I didn't do anything wrong."

After argument by counsel, the dependency court indicated it weighed the credibility of all of the witnesses and found S.B. to be the most credible. In particular, the court stated, "What I find very compelling in this matter is that when confronted with the option of being returned to father and remaining in foster care, [S.B.] chose foster care. I think that demonstrates and supports what she's been saying regarding how unhappy she was with her father and father's family." The court found DCFS had met its burden of proof to establish jurisdiction by a preponderance of the evidence as to each of the allegations in the first amended petition. The court therefore sustained the petition, finding that S.B. was a dependent of the court under section 300, subdivisions (a) and (b).

*Disposition*

Turning to the issue of disposition, father's counsel indicated that father might be willing to waive reunification services if the court would terminate jurisdiction with an order to the family law court granting custody to mother. DCFS's counsel argued that termination with a family law order was not appropriate given the department's "grave concerns" about father "going right back into family law court, where he feels very comfortable," and where S.B. would have to deal with "another court and a new attorney." The court had previously noted that, since 2000, father had been represented

9

by counsel in the family law court and that mother was at "a tremendous disadvantage." Although father stated he was not planning to return to family law court, the dependency court expressed concern that father might do so. The court then continued the matter for disposition, to allow the parties to discuss the issue.

On October 17, 2013, the social worker spoke with father about visitation with S.B. In contrast to his counsel's prior statements, father stated he was interested in having S.B. live with him and in having unmonitored contact with her. However, father also reported that S.B. said if she had visits with him she would commit suicide, and that he did not want to place S.B. in that position.

At the continued disposition hearing on October 22, 2013, father requested that the dependency court terminate jurisdiction because S.B. was living with mother, a non-offending parent. Father's counsel argued that the case should not be kept open based on speculation that father would pursue a remedy in family law court. He also indicated that father was "not going to participate in . . . the case plan" because he did not "think it [was] needed."

Counsel for mother and S.B. joined DCFS's argument urging the court to continue its jurisdiction over the case, contending that S.B. needed continued protection by the court and that S.B. and mother required continued services from DCFS. The court found that continued jurisdiction was in the best interest of S.B. given the "nature of this case, with its long history" and that conditions continued to exist which justified jurisdiction. The court agreed that S.B. and mother needed services and indicated that father "is taking this matter a little bit too lightly" and could also benefit from parenting classes and counseling. The court found by clear and convincing evidence that a substantial danger existed to S.B.'s physical and emotional well-being and there was no reasonable means to protect her without removing her from father's physical custody. The court ordered S.B. placed in mother's custody, with reunification services to father, maintenance services to mother, and monitored visitation for father. The case plan, as ordered by the court, also

10

included individual counseling for S.B. and participation by father in a parenting program and individual counseling. Father filed a timely notice of appeal.

## DISCUSSION

Father raises a single claim on appeal: "because, at the time of the jurisdiction hearing, there was insufficient evidence to support a finding [S.B.] was currently at risk of harm and it was no longer necessary to protect [S.B.] from harm, dependency jurisdiction was not required." In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings, we determine if substantial evidence, contradicted or uncontradicted, supports them." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193 (citation omitted).) ""In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the juvenile court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.]" "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

The dependency court found S.B. to be a dependent under section 300, subdivisions (a) and (b). The court may adjudicate a child to be a dependent under section 300, subdivision (a) when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent. . . . For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent . . . which indicate the child is at risk of serious physical harm." Section 300, subdivision (b), in pertinent part, requires a finding that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child." DCFS has the burden of

11

proving by a preponderance of the evidence that the child is a dependent of the court under section 300.  (§ 355, subd. (a); *In re I.J.*, *supra*, 56 Cal.4th at p.773 [citation omitted].)

Father contends that the dependency court erred in sustaining the section 300 petition because there was no evidence that S.B. currently faced a substantial risk of harm.  Father acknowledges that the evidence "arguably showed" that S.B. "had suffered harm in the past" from father, grandmother, and M.W., but that there was no evidence that S.B. was at risk of harm at the time of the jurisdictional hearing, as she had been living with her mother without incident for the past 16 months.  We disagree and conclude that substantial evidence supports the dependency court's jurisdictional findings here.

As an initial matter, father's argument focuses almost exclusively on section 300, subdivision (b) and ignores subdivision (a).  On its face, subdivision (a) permits a court to base dependency jurisdiction on "the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent . . . which indicate the child is at risk of serious physical harm."  Here, there was evidence that father beat S.B. with a belt on at least two occasions, including an incident just a few months prior to the dependency referral, where father struck S.B. more than 10 times, leaving red welts that lasted about a week.  Even if that incident, alone, would not qualify as "serious physical harm" under subdivision (a), evidence of father's conduct, coupled with his lack of remorse – as evidenced by his statements that he "whupped" S.B. to discipline her but "didn't do anything wrong" and he "knows to 'use a belt and not leave any marks or bruises'" – was sufficient to allow the dependency court to reasonably conclude that S.B. was at risk of serious physical harm under subdivision (a).  In fact, as recently as the jurisdiction hearing, father again admitted hitting S.B. with a belt but continued to deny any wrongdoing, thus demonstrating his lack of concern with the allegations of physical abuse and lack of insight into the harm caused by this conduct.

12

With respect to subdivision (b), father focuses on the fact that it permits jurisdiction "only so long as is necessary to protect the child from risk of suffering serious physical harm," and therefore requires some showing "that, at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur). [Citations.]" (*In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1396.) Thus, father contends, because S.B. was living with mother at the time of the jurisdictional hearing, there was no evidence of any future risk to S.B., since the risk alleged by DCFS was based only on conditions that existed while S.B. lived with father.

We disagree, and conclude that S.B.'s placement with mother under the circumstances of this case does not preclude a finding of substantial risk of serious harm under section 300, subdivision (b). As demonstrated by the case law cited by father, dependency jurisdiction cannot lie under subdivision (b) where the child is placed with a non-offending parent *and* the circumstances show that such placement eliminates the risk of future harm to the child. For example, in *In re A.G.* (2013) 220 Cal.App.4th 675, 683, the court overturned a finding of jurisdiction under section 300, subdivision (b), because the petition was premised *only* on allegations that the mother was "mentally ill and is unable to care for the minors," and lacked any evidence of harm. Crucially, the court found that not only was the father able to care for the children, he had taken steps to "protect them from any harm from Mother's mental illness." (*Id*. at p. 684) Similarly, *In re Phoenix B.* (1990) 218 Cal.App.3d 787, 792-793, involved the detention of a child based solely on the mother's hospitalization for mental illness. The petition was therefore dismissed once it was determined that the father "provided appropriate care and the minor's welfare was not endangered by placing her with the father." (*Ibid*.; see also *In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 [rejecting jurisdiction where no evidence of physical harm to children and no evidence of future risk based on domestic violence as parents had separated]; *In re J.N.* (2010) 181 Cal.App.4th 1010, 1025-1026 [rejecting jurisdiction based on single drinking and driving incident where no evidence of an

13

ongoing substance abuse problem]; *In re Jennifer P*. (1985) 174 Cal.App.3d 322, 327 [rejecting jurisdiction where mother "immediately took steps" to prevent further contact between child and abuser, including pursuing a criminal action, obtaining a temporary restraining order, and seeking modification of the divorce decree to gain sole custody of the child].)

Here, on the other hand, there was substantial evidence of a continuing risk of harm to S.B. based on father's lack of remorse and repeated attempts to circumvent the dependency process. The juvenile court sustained allegations that father physically abused S.B. with a belt, failed to protect her from sexual abuse by a paternal cousin and physical abuse by grandmother, engaged in sexual activity and explicit sexual conversations in S.B.'s presence, had a filthy, unsanitary home, failed to protect S.B. from a paternal cousin who forced S.B. to drink alcohol, and had an unresolved history of inappropriate sexual boundaries. More importantly, the record shows that, at the jurisdiction hearing, father either denied, minimized or failed to take responsibility for each of these issues. Father did not understand why S.B. did not want to live in a home where she had been subjected to sexual and physical abuse at both his hands and the hands of paternal relatives. Father also continued to deny his own history of unresolved sexually inappropriate behavior in the presence of children, including his sexual behavior with mother while she was underage and his repeated inappropriate sexual behavior in S.B.'s presence.

In addition, the evidence of the limited contact between S.B. and father during the course of the dependency proceeding further supports a finding of an ongoing risk of harm. Notably, a social worker had to end a monitored telephone conversation between father and S.B. for the child's birthday in March 2013 because of the father's behavior. S.B. testified that father told her "Fuck you" during the call. Moreover, S.B. testified that father offered to let her live with her mother if she would say that she made up the allegations, and father unapologetically admitted to calling S.B. directly (and then to having his son do the same) in violation of the requirement that his telephone calls with

14

her be monitored by DCFS. Given father's attitude and demonstrated willingness and ability to circumvent the restrictions imposed by DCFS and by the court, there was sufficient evidence for the dependency court to conclude that S.B. would not be shielded from risk of future harm merely because she was living with mother. This was compounded by the lack of evidence that mother would be able to prevent father's behavior; indeed, mother repeatedly expressed concern over father's ability to manipulate her and the court.

Father suggests that the court "should have dismissed the dependency petition with exit[] orders that the mother have physical custody with limited visitation" to father, in order to "minimize or eliminate the danger" of those visits to S.B. This argument blurs the distinction between jurisdiction and disposition. The dependency court's authority to issue the exit orders suggested by father attaches once the dependency court has assumed jurisdiction over the minor pursuant to section 300. (See section 362.4 ["When the juvenile court terminates its jurisdiction over a minor *who has been adjudged a dependent child* of the juvenile court . . . , the juvenile court on its own motion, may issue . . . an order determining the custody of, or visitation with, the child."] [emphasis added]; *In re John W.* (1996) 41 Cal.App.4th 961 [exit order following adjudication]; *In re Chantal S.* (1996) 13 Cal.4th 196 [same].) Father here seeks to invalidate the adjudication itself, and cannot therefore rely on the possibility of post-adjudication exit orders to eliminate a risk of harm to S.B. from her visits with father.

Finally, DCFS makes a number of arguments as to why the disposition order must be affirmed. However, father has clearly articulated that he is not challenging the disposition order on the merits in this appeal. As previously discussed, he claims the dependency court should have dismissed the petition at the jurisdiction hearing and therefore never should have proceeded to the disposition stage. Accordingly, we need not reach this issue.[5]

---

[5] We note, however, that the dependency court has discretion under section 361.2, upon placing a child with a formerly non-custodial parent, to either terminate jurisdiction

15

**DISPOSITION**

Affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

WILLHITE, Acting P. J.

MANELLA, J.

---

(as father requested during the dispositional hearing here) or retain jurisdiction and order services to either or both parents.